MARY J. BISLAND *v.* A. PROVOSTY et al.—McKLEROY & BRADFORD, and HALL, RODD & PUTNAM, Intervenors.

| 14 | 169 |
|----|-----|
| 46 | 343 |
| 14 | 169 |
| 47 | 1058 |
| 47 | 1274 |
| 14 | 169 |
| 51 | 1464 |
| 14 | 169 |
| 52 | 1103 |
| 14 | 169 |
| 111 | 415 |
| 14 | 169 |
| £118 | 267 |

The prohibition in Art. 2412 of the Code against the wife's binding herself for her husband, or conjointly with him, for debts contracted by him before or during the marriage, is, to a certain extent, one affecting the public order.

Neither the acknowledgment of the wife that the debt was contracted for the benefit of her separate estate, nor the fact that the money was actually paid into her hands, will estop her from afterwards denying her indebtedness, and the creditor is then put upon proof that the debt inured to the benefit of the wife's separate estate.

The doctrine of estoppels has no application to the contracts of married women, when they or their property are sought to be held liable for the debts of their husbands.

An exception to the rule in regard to the wife's incapacity to bind herself for a debt which does not inure to her separate benefit, may exist when she has actually committed a fraud, but not when it has been impliedly or constructively committed.

When there has been no contract of letting and hiring of slaves, a privilege on the crop raised by them cannot be asserted.

APPEAL from the District Court of the Parish of Pointe Coupée, *Ratliff*, J. T. J. *Cooley* and *U. B. & E. Phillips*, for plaintiff. *A. Provosty, Clark & Bayne, G. L. Lacy* and *R. A. Upton*, for defendants and intervenors, appellants.

MERRICK, C. J. This suit is brought to recover fifty-five slaves in the possession of the defendant, *Provosty*, and a large sum for the revenues or hire of said slaves. The plaintiff's original title to the negroes in controversy, has not been seriously questioned in this court, and for the purpose of this decision, we shall assume her title derived from her father and mother's estate in Mississippi, by inheritance or distribution, to be valid, merely remarking, that we discover no ground upon which her original title can be successfully impugned.

The controversy in this case arises out of certain acts of mortgage and the

22

renunciations thereto, signed by the plaintiff and relied upon by the syndic and intervenors as a bar to plaintiff's action.

The first of these mortgages bears date, New Orleans, February 28th, 1856, and was executed by *Robert W. McRae,* the husband of the plaintiff alone, in favor of the intervenors, *McKleroy & Bradford,* to secure them for all advances, acceptances, &c., which they might make the said *McRea,* and the said *McRea* and partner, *C. F. McRea,* during the period of the three ensuing years.

The property mortgaged consisted of the Glen Mary plantation owned by *Robert W. McRea,* and about eighty negroes, including those claimed by plaintiff, then about fifty in number. This mortgage, after describing the land and negroes, contains the following clause, viz :

" Which land was acquired by said mortgagee on the 24th of January, 1853, from *Mrs. Widow Gondreau,* by act passed before *V. Ledoux,* Notary, in said parish, (Pointe Coupée,) *and slaves from different persons at different periods by purchase.*"

The act also contained a covenant on the part of *McRea* to procure the renunciation of the plaintiff, (his wife,) to the same. Between the execution of this mortgage and the third day of April following, *R. W. McRea* drew drafts, having different periods to run, in favor of various persons, to an amount exceeding sixty thousand dollars, which, with other sums, were afterwards paid by *McKleroy & Bradford.* A portion of the drafts appear to have been accepted, but at what time, it does not appear.

On the third day of April, 1856, the plaintiff appeared before the notary who had received the act of mortgage of her husband, and in an act in which the object of the act of mortgage is set forth and the description of the property recapitulated, declared that she ratified and confirmed the mortgage in all its parts, without exception or reservation, meaning and intending that the act should have full effect, force and virtue, and the same validity as though she had been present at the execution of and signed the same. The act then recited, the reading of the act of mortgage, and concluded with the usual renunciation, under the Act of the Legislature of 1835.

The other act of mortgage was executed in the city of New Orleans, on the 26th day of February, 1857, by *Robert W. McRea,* acting in his own name and as agent for his brother, *Conrad F. McRea,* and the copartnership between himself and brother in favor of the intervenors, *Hall, Rodd & Putnam,* to secure them for advances made and to be made, supplies purchased and to be purchased, and for drafts accepted and to be accepted during the term of five years, and to the amount of $35,000. This mortgage was given upon the Crescent Park place in the parish of Pointe Coupée, and twenty-nine slaves belonging to the copartnership of *R. W. & C. F. McRae,* and also upon the Glen Mary plantation and slaves, previously mortgaged to *McKleroy & Bradford.* Twenty five of these slaves were described as purchased of *Mrs. Gondreau,* and fifty, (which, with their increase, are the subject of this controversy,) are described in the act of mortgage, in these words : " And also the following named slaves for life, placed on the said Glen Mary Plantation, by the said *Robert W. McRea, and his seperate property, to wit,*" &c.

This act was signed by *R. W. McRae* individually, and in the name of the copartnership. On the third day of March of the same year, 1857, before a Notary in the parish of Pointe Coupée, *R. W. McRae* and his wife, the plaintiff, and *Conrad F. McRae* together with his wife, passed an act of ratification and

r enunciation in favor of *Hall, Rodd & Putnam,* in which the mortgage, executed on the 26th of February, was substantially recited, and the property described with the single exception of the clause which we have just quoted. In the act of renunciation, it is recited in these words : " And also the following named slaves, placed on said plantation by the said *Robert W. McRae,* since his said purchase, *which are separate property, viz,*" &c.

The act also declares that the parties have carefully examined a certified copy of the act of mortgage, and that they ratify the same. The act then concludes with a renunciation of the tacit mortgage by the plaintiff, and *Mrs. Georgiana McRae,* wife of *Conrad F. McRae,* in the usual form. The day the mortgage was executed, *R. W. McRea* drew drafts upon *Hall, Rodd & Putnam,* for $32,000, which were accepted, but it does not, however, appear at what time.

Previous to the execution of the mortgages in favor of *Hall, Rodd & Putnam,* viz, on the 23d day of February, 1857, *McKleroy & Bradford,* took judgment by confession in the Fourth District Court of New Orleans, against *R. W. McRae,* for $81,990 98, with a recognition of the mortgage upon the land and slaves. On the 3d day of March, 1857, the plaintiff, in another act which recited *this judgment,* released the property from her matrimonial, dotal and paraphernal rights, and·from any claims, mortgages and other privileges to which she might be entitled in virtue of her marriage.

On the 20th of January, 1858, *Hall, Rodd & Putnam,* obtained judgment by confession, in the Fourth District Court of New Orleans, against *R. W. McRae,* for $28,385 06, with interest, also recognizing their mortgage.

Execution having issued on the two judgments, and the Glen Mary plantation and all the slaves thereon having been seized under them, *R. W. McRae* made, on the 6th day of March, 1858, a surrender of his property to his creditors, but omitted from his schedule the negroes claimed by his wife.

The same day the defendant, *Provosty,* placed an overseer in charge of the property, including that claimed by the plaintiff. On the ninth day of March, the plaintiff and her husband executed a notarial act, by which she professed to resume the administration of her paraphernal property, and the same day her attorney made a formal demand of the defendant, *Provosty,* of her negroes, but they were not given up. On the sixteenth day of March, the creditors deliberated, and elected the defendant, *Provosty,* syndic, and he qualified the next day by giving bond.

On the 29th day of May, 1858, the plaintiff instituted the present action against the defendant, *Provosty,* both in his individual capacity and as syndic, to recover, as we have already observed, the slaves and the value of their services. *McKleroy & Bradford* and *Hall, Rodd & Putnam,* intervened in the suit.

Judgment was rendered on the 9th day of October, 1858, in favor of the plaintiff for the slaves claimed in her petition, and the sum of $520 per month, from the 6th day of March, 1858, until the slaves shall be delivered to the plaintiff for their hire, as against the syndic, with a privilege upon the crop of 1858 in his hands. The syndic and intervenors appeal.

As the defence of the syndic and the claims of the intervenors are based upon the acts of mortgage and renunciation, we shall consider the matters discussed in the various briefs and oral arguments collectively.

The question of plaintiff's original title having been disposed of, the following points made by the appellants and appellee, seem to cover the questions in controversy, viz :

1st. " That plaintiff admitted the slaves in controversy to be the property of her husband, and intervenors acted upon the strength of such admission ; and as a consequence, she is judicially estopped from the denying the same, even though made during coverture.

2d. " That the conduct of the plaintiff has been deceitful and unfair, not to say fraudulent ; and as a consequence, *Mrs. McRea* is deprived of the right to ask assistance at the hands of the court."

3. The judgment of the lower court is erroneous if the preceding grounds are not tenable, because the amount allowed for the hire of the slaves is excessive. And,

4. The appellee contends that the judgment for the value of the services of the slaves ought to be against the defendant, *Provosty*, in his individual capacity.

I. Although it does not appear at what time the drafts of *McRae* were accepted by the intervenors, we think it must be inferred that a portion of the indebtedness, amounting to a large sum in each case, was furnished by them after the act of renunciation was passed. It is there urged that *McRae*, by the Acts of mortgage, declared that the slaves in controversy were his, and in the acts of renunciation the plaintiff, so far from setting up title in herself, recognized and confirmed the statement of her husband that he was the owner of the slaves ; and it is contended that the intervenors acted upon the faith of her admission, and as a consequence, she is is estopped from controverting the title of her husband. It is not pretended that the debts contracted by *McRae* enured to the benefit of his wife. They were, therefore, debts for which the wife could not bind herself in any form of contract, by reason of an express prohibition of the Code. C. C. 2412. This prohibition is, to a certain extent, one affecting the public order. *Gasquet* v. *Dimitry*, 9 L. R. 590. It is so imperative, that it has been held, and is well settled, that though the wife in the act acknowledge that the debt was contracted for the benefit of her separate estate, or though the money be actually paid into her hands, yet, so far from being estopped, the simple denial of the wife shall put the creditor, in each of these cases, upon proof that the debt enured to the benefit of her separate estate. *Erwin* v. *McCalop*, 5 An. 173 ; *Brandigee* v. *Kerr*, 7 N. S.; *Beauregard* v. *Her Husband*, 7 An. 294. The reason of the rule, as it has been often reiterated, is, that if the wife were to be concluded by her admissions in the contract, it would only be necessary to change the form of the instrument, in order to evade the law. In reference to this subject, the court said, in the case of *Cuny* v. *Brown*, 12 Rob. 84 : " This prohibition cannot be evaded by disguising the suretyship under the specious form of some other contract, which the wife might validly contract. We will endeavor to look through such disguises, and give effect to the provisions of law for the protection of the rights of married women." This was reiterated in the case of *Theriet* v. *Voorhies*, 12 An. 852 ; and it was again said, " It is the uniform practice of this court to look through all disguises in which men may shroud their business dealings ; to prevent, so far as possible, the property of the wife from being sacrificed for the debts of her husband, from which she derives no benefit." In *Pascal* v. *Sauvinet*, 1 An. 429, it was said that " whatever form the contract may be made to assume, its true character may be inquired into, and when it has not turned to her benefit, she will be relieved from the obligation." See also *Provosty* v. *Demoulin et al.* 14 An. In *McIntosh* v. *Smith* it was held, that where a wife stood by and saw her property sold to pay her husband's debts, that she was not estopped from asserting her ownership subsequently. The court said : " If she suffer it to be done without opposition, the

law presumes that she was prevented from asserting her rights. The legal presumption which excuses her when she commits a certain felony in company of her husband, must avail her also in cases of this kind." 2 An. 756.

The wife is not, therefore, estopped by the assertion of her husband, con'ained in his act of mortgage, that the property belonged to him, nor by her act of renunciation; for the reason of the law is the same in this as in the cases cited. If the assertion of ownership in the husband, in the act of mortgage, could bind the wife, the Article 2412 of the Civil Code would be a dead letter, and this *formula* would be introduced into every notarial act intended to be signed by a married woman. Nor do we think the fact that the money was furnished upon the faith of the mortgage, a circumstance which distinguishes this case from all others. It was so furnished, upon the note sued upon in the case of *Brandigee* v. *Kerr*, and it is assumed by the court, that the money was paid into the hands of the wife herself.

We conclude, therefore, that the doctrine of estoppels has no application to the contracts of married women, where they or their property are sought to be held liable for the debts of their husbands.

II. In regard to the question of fraud, it may be observed that the supposed fraud consists in signing an act of renunciation to a mortgage in which the husband had included his wife's property with his own, and mortgaged the same, describing it as his separate property. This act of mortgage appears to have been prepared by other persons, out of the presence of the wife, and the fraud must therefore consist in having signed an act of renunciation, in which she recognized the declaration that all the slaves upon her husband's plantation were his property. In the majority of cases, on this state of facts, there would be as much reason to charge the parties who had signed the original act with fraud, as there would be to charge the wife. And this will be quite evident, if we reflect upon how little attention is given by women to matters of business, and the manner in which these prolix notarial acts are usually passed.

It is a rule of our law that fraud must be proven. A constructive fraud cannot be admitted to deprive a married woman of her estate, for, after all, it would be nothing more than an estoppel, which we have just demonstrated has no application to contracts entered into by married women for the benefit of their husbands.

The rescripts of Antoninus and Severus—*Decipientibus mulieribus Senatus-consultum auxilio non est*—is cited as making an exception to the rule. The *senatus-consultum* referred to was that of Velleianum which was much more comprehensive than the 61st law of Toro or Article 2412 of the Civil Code. *Velleiano Senatus-consulto plenissime comprehensum est, ne pro vello fœminœ intercederent.* D. 16, t. 1, l. 1.

The exception therefore became very important, as the *senatus-consultum* applied to women whether married or single, or under the power of others, and from its tenor and the context, it is evident it can have its application only where the woman has actively and not impliedly or constructively committed a fraud. See D. 1. xvi, t. 1, lex. 2, § 2 & 3.

Under our Article 2412, which is confined exclusively to the contracts of married women, it is supposed that the wife may be induced to sign a contract injurious to her rights under the marital influence. Hence the Act of 1835 was passed which required her to be examined separate and apart from her husband before she could be permitted to renounce her tacit mortgage, and hence prescrip-

tion is not permitted by Article 3491 to run against her in any case during the continuance of the marriage, where her action may be prejudicial to the interest of the husband.　See also *McIntosh* v. *Smith*, 2An. 756.

It has been demanded of us with great earnestness by counsel for the intervenors, whether we are prepared, by affirming this judgment, to sanction a doctrine which will be extremely detrimental to the commercial interest and enable married persons to commit the greatest frauds upon commission merchants and others advancing them funds?

It is a sufficient reply to this to say, that ordinary prudence requires a man who is about to purchase or to advance large sums upon a mortgage upon real estate and slaves to require a production of the title papers or, where these are wanting, certificates and affidavits of disinterested persons to supply the loss.　A party who neglects these most obvious and ordinary precautions can only charge his losses to his own want of care.

We are not here to make laws for the benefit of particular classes.　It is our duty to expound the laws as we find them and leave it to the Legislature to introduce such changes as the public interests require.

Again, we are admonished, and authorities are cited to show that suitors must come before courts of justice with clean hands and that courts of justice cannot come in contact with falsehood but to denounce it, and that it is an exploded and antiquated doctrine that the rights of married women are to be protected under all circumstances.

For a reply it is sufficient to say that where the law declares that the weak shall be protected, the courts are not to withhold the relief which the law grants, because such person may have been induced by improper marital influences to sign acts ratifying or confirming that which is not strictly true.

We have been cited to authorities of our sister States, supposed to be applicable to the question of fraud.　It is unnecessary to consider them here, and it is a sufficient answer to whatever inference may be drawn from them, to say that they are authorities derived from other systems of law, and where the State policy may be somewhat different from our own.

We are also referred to the case of *Bein et al* v. *Heath*, 6th Howard, 239, as a just exposition of our law on this subject by the Supreme Court of the United States.　This case, it must be borne in mind, was decided on the chancery side of the court, and was governed by the rules of chancery law rather than the laws of Louisiana.　The case, therefore, though somewhat at variance with our decisions cannot be considered as furnishing a new rule for the courts of this State. We think it safer to follow in the beaten path of our predecessors.

The jurisprudence of the State had been their study during their lives, and we may safely conclude they had comprehended its spirit and its policy.　If innovations are to be made, as we have already observed, they can be made by the Legislature much more appropriately than by the courts.

III. On the subject of the value of the services of the slaves, we think the District Judge has formed a just estimate.　He had the witnesses before him and he appears to have selected a medium between the extremes.

IV. The appellee demands, by her answer to the appeal, that the judgment be amended, so as to give her a personal judgment against the defendant, *Provosty*. This change in the judgment is resisted by the defendant, *Provosty*, on the ground that he appealed as syndic, and not individually.　On an examination of the entries on the minutes and the appeal bond we think he stands before this court

in both capacities. Were it not so, it would be our duty to dismiss the appeal for the want of proper parties, viz : *A. Provosty*, in his individual capacity, in whose favor judgment was rendered in the lower court. As the mention of *A. Provosty* in the bond and motion for appeal may be construed to mean either capacity, and the addition of syndic in one part of the bond and its omission in another may be regarded as a *descriptio personæ*, we think in the absence of any phrase excluding the idea of an appeal in his individual capacity, that it may be held that the defendant intended to bring himself before us in such capacities as should be necessary to maintain the appeal.

It has been already shown that the defendant, *Provosty*, took possession of the slaves before his appointment as syndic, and that on demand he refused to deliver them to the plaintiff, having contested her title to the present time. It is therefore evident that there is no contract of letting and hiring between the parties, and, as a consequence, no privilege on the crop. See *Fisk* v. *Moores*, 11 Rob. 280, and *Blanchard* v. *Davidson*, 7 An. 654.

The right to recover the value of the services of the slaves is a part of the so called *omnis causa* of the civilians, and partakes of the nature of the real action which it follows. C. C. 491 ; 3 L. R. 550 ; 6 Savigny, 246, 251, Berlin ed. It would seem, therefore, that if the right of the plaintiff to recover against the defendant in his individual capacity be recognized, that the revenues will follow the main action by right of accession. Mackeldey, P. Speciale, §302, No. 4. In the case of *Calmes* v. *Carruth*, 12 Rob. 664, a case very similar to the present, it was held that the defendant was liable in his individual capacity. It is proven in this case by one witness, that the services of the negroes were indispensible to the creditors in order to take off the crop. If this be so, it will doubtless enable the syndic to charge as a part of the expenses of making the crop the sum which he is hereby condemned to pay to the plaintiff for the value of the services of the slaves.

It is, therefore, ordered, adjudged and decreed by the court, that the judgment of the lower court be amended, so that in lieu and place of the judgment against the syndic for the hire of said slaves with a privilege upon the crop in his hands, it be ordered, adjudged and decreed by the court, that the plaintiff do have and recover judgment against the defendant, *Auguste Provosty*, individually, for the sum of five hundred and twenty dollars per month, from the sixth day of March, A.D. 1858, until said slaves shall be delivered to the plaintiff, and that said judgment so amended be affirmed, the appellants paying the costs of the appeal.

BUCHANAN, J., dissenting. I dissent from the decree pronounced in this case, for reasons given in my dissenting opinion in *Belouguet* v. *Lanata*, 13 An. 2.